BARCLAY HAVILAND, Respondent, v. MARTHA T. WILLETS et al.,
                        Appellants.

While a party to a written instrument may not invoke the aid of a court
    of equity because of a mistake of law on his part, where there is no
    improper conduct on the part of the other party, where the mistake
    on his part is shown, and also either positive fraud or inequitable,
    unfair and deceptive conduct on the other side, which tends to confirm
    the mistake and conceal the truth, it is the right and duty of equity to
    award relief.
H. died leaving the plaintiff his sole heir and next of kin him surviving,
    and leaving a will by which he gave a legacy to plaintiff, and his residuary
    estate to two persons named, one-half to each. One of these died before
    the testator, leaving two children; the other was executor under the
    will and the sole surviving executor. Plaintiff was, at the testator's
    death, seventy-three years of age. Both he and the executor believed at
    the time of the reading of the will that the share of the residuary legatee
    who had died went to his children. The executor then proposed to give
    plaintiff a sum specified, he to release all his interest in the estate.
    Before, however, an agreement was perfected, the former discovered that
    such legacy had lapsed and that the share went to plaintiff. Without dis-
    closing this the executor drew up an agreement of release which con-
    tained no statement of the facts; this plaintiff signed. Subsequently
    the executor took plaintiff to his counsel, and there plaintiff executed a
    more formal instrument, which recited the death of said residuary legatee
    and the desire and intention of plaintiff to relinquish to the children
    of the deceased legatee all the rights and interests acquired by him as
    heir at law and next of kin, and by which, in consideration of payment
    of the sum agreed upon, he released and discharged such interests and
    authorized payment thereof to said children. In an action to set aside
    said release it appeared that it was read at the time it was executed, and
    that the counsel stated, after the release was signed, that by the
    lapse of the legacy, the ownership thereof vested in plaintiff; this state-
    ment was couched in legal terms, and plaintiff testified that he did not
    hear the statement either of counsel or as read. *Held,* that a question
    of fact was presented, and this court could not dispute a finding that
    plaintiff did not know his legal rights when he executed the release; and
    that, as the evidence showed a studious concealment from plaintiff by
    the executor, in whose position and ability the former reposed some con-
    fidence, of the precise point essential to his free and intelligent action, it
    was competent for a court of equity to cancel the release, so far as law-
    ful payments had not been made under it.
The executor died, and two days thereafter plaintiff was fully advised
    of his legal rights; for three years he remained silent, without

revoking the release, giving any notice of change of intention, or making any complaint, although knowing that the estate was being administered in accordance with it. During the three years large sums were paid to said children out of the estate by the administrators with the will annexed. *Held,* that plaintiff was estopped from recovering back said sums either from said administrators or the persons to whom they were paid; but was entitled to an accounting and to payment of the amount of said residuary share, less the amount paid to plaintiff over and above his legacy and the sums so paid to the children of the deceased legatee.

*Haviland* v. *Willets* (67 Hun, 89), reversed.

(Argued December 15, 1893; decided January 16, 1894.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made February 13, 1893, which denied a motion for a new trial and affirmed a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to set aside a release executed by plaintiff of his interest in the estate of Isaac E. Haviland, deceased, and for an accounting by the administrators with the will annexed of said Haviland, and a determination of the amount due plaintiff as his legatee, heir at law and next of kin, and such other and further relief as might be just and proper.

The following is a copy of the release:

"KNOW ALL MEN BY THESE PRESENTS, that WHEREAS, Isaac E. Haviland, late of the Town of Oyster Bay in the County of Queens and State of New York, departed this life in said Town on the twenty-ninth day of November in the year 1885, leaving a last Will and Testament bearing date the fifteenth day of March in the year 1855, which was duly proved and admitted to probate by and before the Surrogate of the County of Queens on the Eighth day of December in the year 1885 and letters testamentary thereunder were on said last-mentioned day duly granted and issued by said Surrogate to Stephen Taber, the sole surviving Executor in said Will named;

"And, WHEREAS, Barclay Haviland of Millbrook, in the county of Dutchess, is the sole heir at law and next of kin of the said Isaac E. Haviland, deceased;

"And, WHEREAS, the said testator in and by said will, did, after making certain bequests therein set forth, including a legacy of two thousand dollars to the said Barclay Haviland, devise and bequeath the rest, residue and remainder of his estate, real and personal, to his nephews, Stephen Taber and Samuel T. Taber, in equal shares;

And, WHEREAS, the said Samuel T. Taber died in the lifetime of said testator, leaving him surviving two children, Martha T. Willets and S. Phebe Taber Willets, his only issue;

"And, WHEREAS, the greater part of the estate and property owned by the said Isaac E. Haviland at the time of making said will, came to him on the part of his wife, Ruth Titus Haviland, who was related by blood to the said Stephen Taber and the said Samuel T. Taber, and it was the intention of the said testator in making his said will to devise and bequeath to the said Stephen Taber and Samuel T. Taber that part of his estate which so came to him from his said wife, with such further increase and accumulations thereof as might accrue and come to his hands;

"And, WHEREAS, it is the desire and intention of the said Barclay Haviland to carry into effect in all respects the intentions of said Isaac E. Haviland, as above recited, and which are well known to him to be as aforesaid, and to waive, relinquish and give up any and all right, title and interest which he may have acquired in the estate, real and personal of said deceased as such heir at law and next of kin by reason of the death of the said Samuel T. Taber, as aforesaid, to the end that the said surviving children of the said Samuel T. Taber may in all respects receive the same estate, rights and interests in the estate of said testator as they otherwise might have, had they been named as substituted residuary devisees and legatees in said will in the place and stead of their said father in the event of their said father dying in the lifetime of the said testator;

"And, WHEREAS, an appraisement of all the estate, real and personal, whereof the said Isaac E. Haviland died seized or

possessed, has been made by the said Stephen Taber and submitted to and accepted by the said Barclay Haviland, and has been mutually agreed upon by and between the parties hereto, to be for the purposes of this instrument and the settlement of the estate of said testator, the sum of one hundred and ninety thousand dollars;

"And, WHEREAS, it has been determined by the said Barclay Haviland, and agreed by and between him and the said Stephen Taber, individually, and as executor as aforesaid, that the said Barclay Haviland shall take and receive one-tenth part of the said estate, real and personal, at the valuation and appraisement aforesaid, subject, however, to the payment of the general and specific legacies given by said will (excepting the legacy therein given to said Barclay), the commissions of said executor, and the expenses attending the administration of said estate, in full for his rights and interest in said estate; and that the residue of said estate, subject to the payments and deductions aforesaid, shall be divided and distributed as follows: One-half thereof to the said Stephen Taber, and one-quarter thereof to each of the said Martha T. Willets and S. P. Taber Willets, to be received and held by them absolutely as their own property, free from any and all claim of the said Barclay Haviland, his heirs, executors or administrators thereto;

"And, WHEREAS, the said Barclay Haviland is about to grant, release and convey to the said Stephen Taber, by deeds of conveyance bearing even date herewith, all his right, title and interest of, in and to any and all real estate whereof the said Isaac E. Haviland died seized, possessed or entitled to, and to release and convey to the said Stephen Taber, as executor as aforesaid, all his, said Barclay Haviland's, right, title and interest in and to all of the personal property and estate whereof the said Isaac E. Haviland died possessed and entitled to, saving and reserving only to the said Barclay Haviland the said one-tenth part of said estate at the agreed valuation and appraisement above recited, and subject to the payments and deduction from said estate hereinabove referred to, to the end

that the said residue of said estate of said testator, real and personal, then remaining shall be divided and distributed among the said Stephen Taber and Martha T. Willets in the manner and in the proportions aforesaid, which division and distribution among such last-named persons the said Barclay Haviland hereby requests and directs the said Stephen Taber to make, both individually and as such executor shall and will make, but only upon such request and direction and upon the faith of this instrument, the statements herein recited and such request and direction ;

" And, WHEREAS, the said Stephen Taber, as such executor, in part performance of the agreement and understanding above recited and set forth, has this day paid and transferred to the said Barclay Haviland the cash and securities, and the said Barclay Haviland has accepted the sum of eighteen thousand dollars as part of the said one-tenth part of the estate of the said Isaac E. Haviland, deceased, and the said Stephen Taber, individually and as such executor, has agreed to account for and pay over to the said Barclay Haviland the balance or remainder of such one-tenth part, subject to the deduction and payments aforesaid, upon or before the final division and distribution of such estate to be made as aforesaid between the said Stephen Taber and the said Martha T. Willets and S. Phebe Taber Willets ;

" Now, THEREFORE, this instrument witnesseth, that the said Barclay Haviland, in consideration of the above-recited premises and of the sum of one dollar to him in hand paid by the said Stephen Taber, individually and as executor of the last will and testament of Isaac E. Haviland, deceased, the receipt whereof is hereby acknowledged, has remised, released, assigned and transferred, and by these presents doth for himself, his heirs, executors and administrators remise, release, assign and transfer to the said Stephen Taber, as such executor as aforesaid, all right, title and interest, claim and demand of the said Barclay Haviland of, in and to any and all of the personal property and estate whereof the said Isaac E. Haviland died possessed or in any way entitled to, of what nature

or kind, wheresoever situated, to have and to hold the same unto the said Stephen Taber, as such executor, and his successors for the purpose of distribution between himself and the said Martha T. Willets and S. Phebe Taber Willets in manner and form hereinabove recited and set forth.

"And for the consideration aforesaid the said Barclay Haviland hath remised, released and forever discharged, and by these presents doth remise, release and forever discharge, the said Stephen Taber, both individually and as such executor, his heirs, executors, administrators and successors, of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues and sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, premises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or in equity, which, against the said Stephen Taber, either individually or as such executor, the said Barclay Haviland ever had, now has, or which his heirs, executors or administrators hereafter can, shall or may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents, and particularly arising and growing out of the estate, real and personal, or either, whereof the said Isaac E. Haviland died seized or possessed or entitled to, and the administration, settlement, disposition and distribution of said estate, real and personal, or either, saving and reserving, however, only to the said Barclay Haviland, his executors or administrators, the balance remaining due or unpaid to him of the said one-tenth part of said estate at the appraisement and valuation aforesaid, subject to the payment from said estate of the general and specific legacies and commissions of said executor and the expenses of administration as aforesaid, and which balance so remaining of said one-tenth part of said estate, subject as aforesaid, the said Stephen Taber, individually and as such executor, hereby agrees to account for and pay over to the said Barclay Haviland.

"In witness whereof the parties hereto have hereunto set

their hands and seals this eighteenth day of March, in the year
one thousand eight hundred and eighty-six.

> "BARCLAY HAVILAND.    [L. s.]
> " STEPHEN TABER,
> " Individually and as Executor.    [L. s.]"

The material facts are stated in the opinion.

*John R. MacArthur* and *Wm. H. Arnoux* for appellants.
All the equities in the case are in defendant's favor. (R. S.
[8th ed.] 2549, § 524.) The plaintiff, having duly executed
the agreement and release, was bound by its recitals and the
agreement therein made, and cannot now be heard to plead
his own ignorance of any of the facts therein contained.
(*Upton* v. *Triblecock*, 91 U. S. 45; *School Dist.* v. *Stone*,
106 id. 183; *Bowman* v. *Taylor*, 2 Ad. & El. 278; *Green's
Appeal*, 97 Penn. St. 342; *Redwood* v. *Tower*, 28 Minn. 45;
*Lucas* v. *Beebe*, 88 Ill. 427; *Usnia* v. *Wilder*, 58 Ga. 178;
*Glenn* v. *Statler*, 42 Iowa, 107; *Butman* v. *Hussey*, 30
Maine, 263; *Hill* v. *Bush*, 19 Ark. 522; *Henderson* v.
*Dickey*, 35 Mo. 120; *Gilbert* v. *Martin*, 119 N. Y. 298;
*Hobbs* v. *City of Yonkers*, 102 id. 13; *Pindar* v. *R. F. Ins.
Co.*, 47 id. 114.) As matter of law the finding that the
plaintiff executed said instrument under a mistake of fact is
incorrect, being wholly unsupported by the evidence in the
case. But if it were so a mistake of fact made by plaintiff
alone does not warrant a court of equity to interfere.
(*Roberts* v. *Tobias*, 120 N. Y. 1; *Tomplin* v. *James*, L. R.
[15 Ch. Div.] 215; *Jenkins* v. *C. C. Co.*, 48 N. W. Rep.
970; *Crowder* v. *Langdon*, 3 Ired. Eq. 476; *Goddard* v.
*Jeffreys*, 51 L. J. Ch. 59.) Assuming, for the purpose of
argument, that the plaintiff executed said instrument without
knowledge of his rights, and would not have executed the
same if he had known them, and it having been found that
Stephen Taber did know the same, the case presents a mis-
take of law on the part of the plaintiff only, from which a
court of equity cannot relieve him. (*Zollwan* v. *Moore*, 21
Gratt. 313; *Bilbie* v. *Lumley*, 2 East, 469; *Brisbane* v.

*Dacres,* 5 Taunt. 144; *Allen* v. *G. A. Ins. Co.,* 123 N. Y. 6; 2 Pom. Eq. Juris. 843; *Lyman* v. *U. Ins. Co.,* 17 Johns. 373; *Crozier* v. *Acre,* 7 Paige, 137; *Trigg* v. *Read,* 5 Humph. (Tenn.) 529, 533; *Vanderbeck* v. *City of Rochester,* 122 N. Y. 285; *Pooley* v. *City of Buffalo,* Id. 592; *Moran* v. *McLarty,* 75 id. 25.) The acquiescence of the plaintiff in the payments made, with full knowledge of all the facts, constitutes in law a ratification of the agreement for such payments, and he is estopped from rescinding the same. (*Rogers* v. *Ingham,* L. R. [3 Ch. Div.] 351.) Equity will not relieve a party against his own mistakes so far as the rights of others have become vested and the contract executed. (*Queen* v. *Lords of Treasury,* L. R. [16 Q. B.] 357; *Brisbane* v. *Dacres,* 5 Taunt. 144; *Dain* v. *U. S.,* 10 Wall. 1; *Zollman* v. *Moore,* 21 Gratt. 313; *Lamb* v. *Harris,* 8 Ga. 546; *Haddock* v. *Williams,* 10 Vt. 570; *Nobours* v. *Cocke,* 24 Miss. 44; *Essex* v. *Day,* 52 Conn. 483; *Montgomery Co.* v. *A., etc., Co.,* 47 Iowa, 91; *Mays* v. *Dwight,* 82 Penn. St. 462; *Miles* v. *Stevens,* 3 id. 21; *W., etc., Bank* v. *F., etc., Bank,* 10 Bush, 699; *Nicholson* v. *Janeway,* 16 N. J. Eq. 285; *McFarran* v. *Taylor,* 3 Cranch [U. S.], 270; *Weaver* v. *Carter,* 10 Leigh, 37; *Segur* v. *Tingly,* 11 Conn. 134; *Trigg* v. *Read,* 5 Humph. 529; *Harrod* v. *Cowan,* Hardin, 551; *U. Ins. Co.* v. *Alleghany,* 101 Penn. St. 250, 253–255; *Paine* v. *Jones,* 75 N. Y. 593; *Shotwell* v. *Murray,* 1 Johns. Ch. 512; *Story* v. *Conger,* 36 N. Y. 673; *Nevins* v. *Dunlap,* 33 id. 676; *Mead* v. *Ins. Co.,* 64 id. 453; *Moran* v. *McLarty,* 75 id. 25, 28, 29; *Stoddard* v. *Hart,* 23 id. 556, 562; *Lyman* v. *U. S. Ins. Co.,* 17 Johns. 373; *Wells* v. *Yates,* 44 N. Y. 525, 529; *Thomas* v. *Bartow,* 48 id. 193; *Prior* v. *Williams,* 3 Abb. Pr. 624; *Kirkland* v. *Dinsmore,* 62 N. Y. 171; *Boon* v. *Schrenkeisen,* 110 id. 55, 59; *Avery* v. *E. L. Co.,* 117 id. 451; *Dennerlein* v. *Dennerlein,* 111 id. 518; *Jacobs* v. *Moránque,* 47 id. 57; *Weed* v. *Weed,* 94 id. 243; *Flynn* v. *Hurd,* 118 id. 19; *Pooley* v. *City of Buffalo,* 122 id. 592; *Vanderbeck* v. *City of Rochester,* Id. 285; *Tripler* v. *Mayor,* 125 id. 617, 630; *Allen* v. *Ins. Co.,* 123 id. 6, 12.)

To entitle a party to relief from a mistake, it is necessary that the mistake should have been in reference to a material fact, and further that such mistake should have determined the conduct of him by whom it was made, and that the act done would not have been done but for such mistake. (*Dambman v. Schulting*, 75 N. Y. 55, 63; 85 id. 622; *Stutheimer v. Killip*, 75 id. 282; *Segur v. Tingley*, 11 Conn. 134, 143; *McFarren v. Tingley*, 3 Cranch, 270, 281.) Unless the plaintiff has alleged and proved either (1) a mutual mistake, or (2) fraud on the part of defendants, he cannot recover. Under the findings as made by the trial judge there must be a new trial. (*Bonnell v. Griswold*, 89 N. Y. 122; *Conselyea v. Blanchard*, 103 id. 222; *Kelly v. Leggett*, 122 id. 633; *Schwinger v. Raymond*, 83 id. 192.)

*Guy C. H. Corliss* and *Frank B. Lown* for respondent. The executor having previously stated to the plaintiff that the part of the estate in question went to the two daughters of Samuel Taber, deceased, it was fraud in him, on ascertaining the plaintiff's rights thereto, not to apprise him concerning them. (2 Pom. Eq. Juris. § 888; *Reynell v. Sprye*, 1 De G., M. & G. 660.) Assuming that Barclay Haviland executed the paper in question without knowledge that the legacy to Samuel Taber had lapsed, and without knowledge that he, as next of kin, was entitled to the same, this constituted a mistake of fact. (2 Pom. Eq. Juris. 305, 317, § 849; *Cooper v. Phibbs*, L. R. [2 H. L.] 149–170; *Landsdowne v. Landsdowne*, 2 J. & W. 205; *Freeman v. Curtis*, 51 Maine, 140; 1 Story's Eq. Juris. [13th ed.] 183; *Blakeman v. Blakeman*, 39 Conn. 320; *Broughton v. Hutt*, 3 De G. & J. 501–504; 1 Beach Mod. Eq. Juris. §§ 37, 38.) Even if it should be considered a mistake of law, the plaintiff would not be without remedy. (2 Pom. Eq. Juris. § 847; 1 Beach Mod. Eq. Juris. §§ 38, 41, 47; *Schnell v. Ins. Co.*, 98 U. S. 85; *Canedy v. Massey*, 13 Gray, 373; *Kornegay v. Everett*, 5 S. E. Rep. 418; *Benson v. Markoe*, 37 Minn. 30; *G. B. & M. C. Co. v. Hewett*, 22 N. W. Rep. 216; *Bush v. Merriman*, 87

Mich. 260; *Pitcher* v. *Hennesy*, 48 N. Y. 415; *Griswold* v. *Hazzard*, 141 U. S. 260; *Griffiths* v. *Townley*, 69 Mo. 13; *Cooper* v. *Phibbs*, L. R. [2 H. L.] 149; *Blakeman* v. *Blakeman*, 39 Conn. 320; *Reynell* v. *Sprye*, 8 Hare, 222–255; *Boyd* v. *De La Montagnie*, 73 N. Y. 498, 503, 504; *Busch* v. *Busch*, 12 Daly, 476; 102 N. Y. 672; *Stedwell* v. *Anderson*, 21 Conn. 139; *Fitzgerald* v. *Peck*, 4 Litt. 125; *Underwood* v. *Brockman*, 4 Dana, 309; *Conrad* v. *Hughes*, 1 K. & J. 443; *Ramsden* v. *Hylton*, 2 Ves. 304; *Ray* v. *Bank of Kentucky*, 3 B. Mon. 510; *Baughton* v. *Hutt*, 3 De G. & J. 501; *Lawrence* v. *Banbien*, 2 Bail, 623; *Northrop* v. *Graves*, 19 Conn. 548; *Baker* v. *Massey*, 50 Iowa, 399; *Gratz* v. *Reed*, 4 B. Mon. 190; *Culbreath* v. *Culbreath*, 7 Ga. 64.) The failure on the part of Taber, who knew of the lapsing of the legacy, to disclose the same to the plaintiff, was a fraud in law. (2 Pom. Eq. Juris. §§ 955–963; *In re Smith*, 95 N. Y. 516; *Dabman* v. *Schulting*, 75 id. 55; *Cowee* v. *Cornell*, 75 id. 91, 99, 100; *Green* v. *Roworth*, 113 id. 462; *Sears* v. *Schafer*, 6 id. 268–272; *Meyers* v. *Lathrop*, 73 id. 315–321; *Gardinier* v. *Gabriel*, 110 id. 650; *Murray* v. *Marshall*, 94 id. 617; *E. C. F. Co.* v. *Hersee*, 103 id. 25; *Oberlander* v. *Speiss*, 45 id. 175–179; *Parker* v. *Baxter*, 86 id. 586.) The relation of executor and distributee existing between the executor and the plaintiff was a fiduciary relation. (2 Pom. Eq. Juris. § 963; 1 Bigelow on Fraud, 341; 1 Perry on Trusts, 203, 204, § 178; *Statham* v. *Ferguson*, 25 Gratt. 28; Willard's Eq. Juris. 170; *Billage* v. *Southee*, 9 Hare, 534, 540; *Green* v. *Rowarth*, 113 N. Y. 462; *Cowee* v. *Cornell*, 75 id. 91, 101; *Sears* v. *Shaefer*, 6 id. 268–272; 1 Beach Mod. Eq. Juris. §§ 114, 125, 126.) Surprise is a sufficient ground for relief from a mistake of law. (1 Story's Eq. Juris. 129, 143; 2 Pom. Eq. Juris. §§ 847–850.) The appellants assert that equity will not relieve the plaintiff, because the rights of the two daughters have become vested. This is untenable. (*Ranken* v. *Patton*, 65 Mo. 378–415; *Yosti* v. *Lanahan*, 49 id. 599; *Whelan* v. *Whelan*, Id.; 1 Beach Mod. Eq. Juris. § 116; *Bridgeman* v. *Greene*, 1 Wilm. 64; 2

Ves. 627; *Huguenin* v. *Baseley*, 14 id. 279.)  The plaintiff was not guilty of such negligence in not understanding that he had rights from vague recitals, or from the fact that the instrument purported to convey an interest in the estate as will defeat him.  (2 Pom. Eq. Juris. § 856; *Smith* v. *Smith,* 134 N. Y. 62–65; *A. C. S. Inst.* v. *Burdick,* 87 id. 40–46.) It was not necessary for the plaintiff to offer to restore the money received by him before bringing the suit.  (*Allerton* v. *Allerton*, 50 N. Y. 670; *Gould* v. *C. C. N. Bank*, 99 id. 333–337; *I. & T. N. Bank* v. *Peters*, 123 id. 272, 279.)

FINCH, J.  The instrument which equity is asked to cancel and set aside as the deserved relief in this action is a long document, carefully and thoughtfully prepared, loaded with estoppels as the product of numerous recitals, and revealing everything essential to the intelligent action of the plaintiff, except the one single truth which was the most vital of all.  That was left to a possible inference, which, it is true, a man of ordinary ability ought to have drawn; which this plaintiff, if attentive and not negligent, might have easily drawn; but which, according to his evidence and the findings of the trial court, utterly escaped his observation.  We are required, therefore, to assume, however doubtful the proposition may seem to any of us to be, that he signed the agreement in ignorance of his actual rights, and through a mistake either of law or of fact. The circumstances surrounding his action are somewhat unusual, and while in the main undisputed, are yet in many directions open to doubts and conflicting inferences which for us must be solved by the findings.

Isaac E. Haviland married Ruth Titus in 1825.  At that time he was worth but a small amount, while his wife had property of her own valued at about thirty-six thousand dollars.  No children were born of the marriage, and in 1850 the wife died, leaving a will by which she gave all her property to her husband.  It is a natural supposition that the gift may have been the subject of consideration between the two before that will was made, and that the wife, preferring her

husband to the total exclusion of her kindred, may have
expressed some wish that in the end it should go back to them.
At all events a conviction of the justice and propriety of such
a result became firmly fixed in the mind of the husband, for
after his wife's death he explained to his father and his
brother, who is the present plaintiff, his intention to give sub-
stantially the property which came from his wife to her rela-
tives, and made his will in 1855 upon that basis.  At such
date he was worth about forty thousand dollars, of which he
gave to his father two thousand dollars, and to this plaintiff
also two thousand dollars, and beyond a few small legacies,
bequeathed the entire residue to his wife's two nephews,
Stephen Taber and Samuel Taber.  Within a few years there-
after the testator became insane.  In 1860 Samuel Taber was
appointed committee of his estate, but himself died while the
lunatic was living, so that the share bequeathed to him in the
will of Isaac lapsed and became undisposed of by that instru-
ment.  Samuel left two daughters, Martha Willets and Phebe
Willets, who were his sole heirs and next of kin, and who are
made parties defendant in this action.  Upon the death of
Samuel Taber the care of the lunatic's property was given to
Stephen as committee, and he so managed the estate that it
increased from forty thousand dollars to almost one hundred and
eighty thousand dollars during the life of the testator.  How
this increase was accomplished we do not know, but even if
favored by fortunate changes of values, it either arose from
the care and judgment of the wife's relatives, or from a pro-
portionate increase in the value of the property which came
from her.  In 1863 the testator's father died, and in 1885 the
testator himself died, leaving his brother, Barclay Haviland,
his sole heir at law and next of kin, and as such entitled to
take the whole of the legacy to Samuel which lapsed by his
death during the life of the testator, and upon that ownership
Barclay stands as plaintiff in this action.

Soon after the funeral the plaintiff, accompanied by his
daughter, Mrs. Otis, went with Stephen Taber to the trust
company in whose custody the will had been placed and there

read it. Stephen Taber by its terms had become the sole surviving executor. He was a man of conceded business ability, and had been the committee of the deceased, becoming thereby fully acquainted with the situation and amount of all his property. He naturally represented the wife's kindred, of whom he was one, but as executor owed the duty of impartial justice to the legatees as between each other whenever his conduct necessarily affected their relative rights. The plaintiff is described as an " old farmer," and so entitled to some degree of judicial sympathy. His age was seventy-three : in his own right he was poor : but nothing indicates that he possessed less than the average ability of the farming population, which it is not necessary to underrate. For the trouble which arose did not so originate, but sprang from unfamiliarity with legal doctrines and legal rules which in the beginning equally misled both parties. It is not at all doubtful that at the reading of the will both Barclay and Stephen mistakenly supposed that the one-half of the residue bequeathed to Samuel passed to his two daughters, and neither suspected that in truth the whole of it, amounting to almost eighty thousand dollars, was the absolute property of the plaintiff by reason of the lapse which had occurred. At that time in the course of the conversation relating to the will Stephen said that Samuel's share would go to his children and they would represent him. That was the belief of all parties honestly indulged, and its confirmation by Stephen, speaking of it as a matter of course, tended necessarily to prevent any doubt on the subject from entering the mind of the plaintiff. From that time on the mistake operated upon and to some extent controlled his action. Stephen, however, was quick to see how the great increase in the value of the property, had made the testator's scheme of distribution quite inequitable relatively to his known and declared intentions. Some part of the increase was the product of that portion of the estate for which the testator was not indebted to the bounty of his wife, and if his insanity had not intervened he himself probably would have changed the will so as

to meet the changed conditions. The will was not yet proved. How early insanity began might become a troublesome question; and both prudence and justice dictated to Stephen a distribution more favorable to plaintiff, and he accordingly proposed that since at the date of the will nine-tenths of Isaac's property had come from his wife and one-tenth only from his own effort, the increase should be called one hundred and fifty thousand dollars, and that should be divided in the same proportions. This proposal gave to the plaintiff fifteen thousand dollars, and adding to that, as was promised, the two legacies to his father and himself, made him the possessor of nineteen thousand dollars, which for him was a fortune. He did not at the time make any answer. Why he did not accept at once is possibly explainable upon the theory that he desired a more liberal division and hoped to get a better one if he should be slow in its acceptance, but whatever he obtained beyond his legacy he looked upon as bounty bestowed upon equitable considerations, and did not suspect for a moment that he was legally entitled as his own to all that was offered and three times as much in addition.

The mistake common to both soon became the mistake only of one. The findings show that the executor knew the legal consequences of the death of Samuel when the final arrangement was made, but do not determine at what precise time he obtained that knowledge. It appears, however, that he took the will to his counsel, Judge Garretson, for probate; and the latter says that he expressed to Stephen an opinion that the legacy lapsed; that the latter was surprised and doubtful, and requested that the question should be examined; that such an examination was made and the result communicated to Stephen. The will was probated on December 8th, and it was more than three months thereafter before the parties met to resume a discussion of the ultimate distribution. We cannot escape the belief that at some time during this interval, and probably in its early days, Stephen knew the truth from the counsel he had employed. Having this knowledge, the executor sent for Barclay. Instead of disclosing

the very grave mistake which both had made, he drew a paper on the lines of his original proposition, but which contained no statement of the facts, made no revelation of the existing and vital mistake, left Barclay still in the dark, and was devoted solely to the desired distribution. To that the executor obtained plaintiff's signature, and, not yet contented, took him to his counsel to have the agreement firmly riveted by a more formal paper.

What followed furnishes the appellants with the facts upon which they ground their principal argument. They say that Barclay came into court with a falsehood in his mouth; that in his complaint he alleged that the paper which he signed was described to him as a mere receipt; that he did not read it, but signed it in reliance upon that statement; whereas in truth it was correctly read to him, and he was furnished with a copy to enable him to follow the reading, and was permitted to keep that copy in his own possession. So much is true, and the court has so found. It tends to discredit Barclay and requires that we accept his statements with some degree of caution. It is then added that the release as read to him recites the death of Samuel in the testator's lifetime; the consequent lapse of the legacy to him; the position of Barclay as sole heir and next of kin of the deceased; that it then in terms releases and gives up any right which has resulted to the plaintiff; that so it put him on his guard and warned him at least that he was parting with a possible right, and raised the duty of inquiry; that, beyond that, Garretson told him that by the lapse he, as heir and next of kin, was vested with the ownership of Samuel's legacy; and that the plaintiff without denying the fact answers only that he did not hear the statement; and so his claim of ignorance is improbable and unworthy of belief, and should not be allowed. The argument is quite strong, but fails of being conclusive because it does not take into account the point of view from which Barclay was all the time observing the proceedings, and his mental attitude towards what was transpiring before him. He was inattentive and even negligent, but it was because he

thought money was being given to him, that he was parting
with nothing, that no diligence on his side was needed, and
that all the precautions were required for the executor and to
protect him in the arrangement. Bearing that in mind, we
can see how Barclay could have run the gauntlet of the long
recitals and of the counsel's legal opinion, without having his
pre-conceived and settled notion of the situation shaken or
dislodged. There is thus raised a question of fact, and we
ought not, therefore, to dispute the finding that Barclay did
not know his legal rights when he signed the release and the
executor did.

Upon this state of facts it was competent for equity to can-
cel and set aside the release. I have narrated the details at
some length in order that the basis of that conclusion may be
clearly seen, and its doctrine may not be misinterpreted.
Assuming, as counsel for the appellants contends, that Bar-
clay's mistake was one of law, and that the general rule
excludes equitable relief for such a mistake, when it is one
of law pure and simple, and no other elements are present,
it is still obvious that the doctrine does not cover the entire
array of facts here disclosed. It is equally well settled
that where there is a mistake of law on one side, and either
positive fraud on the other, or inequitable, unfair and decep-
tive conduct, which tends to confirm the mistake and conceal
the truth, it is the right and duty of equity to award relief.
All the cases which deny a remedy for mere mistake of law
on one side are careful to add the qualification that there must
be no improper conduct on the other. (*Silliman* v. *Wing*, 7
Hill, 159 ; *Flynn* v. *Hurd*, 118 N. Y. 26 ; *Vanderbeck* v. *City
of Rochester*, 122 id. 285.) There was in this case evidence
of a studious concealment of the precise point essential to the
free and intelligent action of the plaintiff by the executor, in
whose position and ability some confidence was reposed. No
effort or suggestion was made by Stephen to rectify the mis-
take under which Barclay was acting, and even the statement
of his counsel, made at the last minute, occurred after Barclay
was already bound, was directed to Stephen and not to the

plaintiff, and was couched in legal terms, which the latter might not have apprehended even if he had heard them. And that he remained mistaken to the end is indicated by the fact that just before the release was read Barclay asked Stephen to intercede with Martha and Phebe to procure him a larger share, to which Stephen answered merely, " We will see about that." So that upon the facts there is evidence to support the finding of Barclay's mistake and the legal conclusion founded thereon. Much more should the rule we have asserted apply in a case where the release is utterly without consideration, and where its true legal effect is simply an authority by Barclay to Stephen to give away the former's property through ignorance on his part of his ownership.

But while we follow the courts below thus far, we cannot approve of the relief awarded to its full extent, and that for reasons which originate in Barclay's conduct after the execution of the agreement. Under it Stephen paid over to Barclay eighteen thousand dollars, and to Phebe Willets one thousand dollars, but died in April, 1886, without making further payments. Two days after his death the plaintiff was fully apprised by his own selected counsel of his entire legal rights, and no longer labored under any mistake either of fact or of law. Nevertheless, for more than three years thereafter, he remained utterly silent, never in any manner revoking the authority which he had given, knowing that the estate was being administered in accordance with it, and making no complaint of mistake or wrong, and giving no notice of any change in purpose or intention. After Stephen's death Thomas Taber and Martha Willets were appointed administrators with the will annexed, and paid over large sums, in pursuance of the agreement, to the two daughters of Samuel, without even an intimation from plaintiff of any objection or disapproval, and after Barclay had obtained a full knowledge of all his rights. There seems to be a disagreement between the court and the defendants' counsel as to the amount so paid, but whatever it be, we are of opinion that the plaintiff is estopped from recovering back

either from the administrators or from the persons to whom the payments were made, all sums paid after Barclay knew his rights, which he himself fixes as two days after Stephen's death, and covers all the payments made by the administrators. The agreement was his specific direction to those who were administering the estate to make the payments which they did make ; if he intended not to be bound it was his duty to speak, and he had full opportunity to do so ; silence misled to their harm both the administrators and the supposed legatees ; the former made and the latter accepted the money as rightfully payable and due, and the one incurred risk and the other may have spent the money or changed modes of life in consesequence, and certainly thereby incurred an unknown and unsuspected obligation, if required to return the fund. Under such circumstances the plaintiff is estopped from a recovery. The moment he learned his real rights it was his duty to speak, he had full opportunity to speak, and he knew that his silence would necessarily mislead the other parties to their harm. (*Erie Co. Sav. Bk.* v. *Roop*, 48 N. Y. 298 ; *Blair* v. *Wait*, 69 id. 113 ; *Viele* v. *Judson*, 82 id. 32 ; *The Queen* v. *Lords of the Treasury*, 16 Ad. & El. 357 ; *Brisbane* v. *Dacres*, 5 Taunt. 144.) Indeed, if the case should be reduced down to its simplest elements, and treated from the moment in which Barclay knew his rights on the basis of a mere gift which he had authorized the representatives of the estate to make out of his own share, he could not recover back from the donees the gift so far as executed. It cannot be that a gift voluntarily made, without mistake or fraud, can be at will recovered back ; and from the day when Barclay knew that the lapsed share was his every payment made to Samuel's daughters was his payment because made by his direction and authority, with full knowledge of both law and facts, and by the assent of his silence during more than three years. We have been unable to see any ground on which the payments made after Stephen's death can be re-claimed. But the judgment covered the whole lapsed legacy, and possibly would have even invaded Stephen's rightful share. The case must go back for a re-trial. The

plaintiff may then have judgment for the cancellation of the release, so far as lawful payments have not been made under it, and for so much of the residuary share bequeathed to Samuel as, on an accounting, is shown to be its amount, less the amount paid to plaintiff over and above his legacy, and less also the sums which have been paid before the commencement of this action to Martha and Phebe Willets by the administrators. The balance of the lapsed share remaining after those deductions is all that the plaintiff will be entitled to recover.

The order and judgment should be reversed and a new trial granted, costs to abide the event.

All concur, except BARTLETT, J., not sitting.

Judgment reversed.